UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| NECA-IBEW PENSION FUND (THE DECATUR PLAN) and DENNIS PALKON, Derivatively on Behalf of CINCINNATI BELL INC., | ) ) ) ) | No. 1:11-cv-00451-TSB |
| | ) | Judge Timothy S. Black |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| PHILLIP R. COX, BRUCE L. BYRNES, JAKKI L. HAUSSLER, CRAIG F. MAIER, ALEX SHUMATE, JOHN M. ZRNO, JOHN F. CASSIDY, GARY J. WOJTASZEK, CHRISTOPHER J. WILSON and TOWERS WATSON & CO., | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| CINCINNATI BELL INC., an Ohio corporation, | ) ) ) | |
| Nominal Party. | ) ) | |

AMENDED VERIFIED SHAREHOLDERS DERIVATIVE COMPLAINT FOR BREACH OF
FIDUCIARY DUTY OF LOYALTY, AIDING AND ABETTING
AND UNJUST ENRICHMENT

ROBBINS GELLER RUDMAN
   & DOWD LLP
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
FRANCIS A. DIGIACCO
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

LANDSKRONER • GRIECO • MERRIMAN, LLC
JACK LANDSKRONER (0059227)
DREW LEGANDO (0084209)
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

## INTRODUCTION

1.      This is a shareholders derivative action on behalf of nominal party Cincinnati Bell Inc. ("Cincinnati Bell" or the "Company").  The complaint seeks relief against the majority of the Cincinnati Bell Board of Directors, namely defendants Phillip R. Cox, Bruce L. Byrnes, Jakki L. Haussler, Craig F. Maier, Alex Shumate, and John M. Zrno (together, "Cincinnati Bell Board"); Cincinnati Bell's top executives, namely defendants John F. Cassidy  (Cincinnati Bell's President and Chief Executive Officer ("CEO")), Gary J. Wojtaszek and Christopher J. Wilson; and Cincinnati Bell's compensation consultant, defendant Towers Watson & Co.

2.      On May 3, 2011, 66% of voting Cincinnati Bell shareholders rejected the Company's excessive compensation for its CEO and executives for 2010.  The 2010 executive compensation, which included a 71.7% raise for Cincinnati Bell's CEO, despite Cincinnati Bell's $61.3 million decline in net income and negative 18.8% annual shareholder return, was approved by the Cincinnati Bell Board and unanimously recommended for shareholder approval by the directors.  Cincinnati Bell is only one of a handful of U.S. companies to fail to receive majority support for its executive compensation under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 "say-on-pay" law ("The Dodd-Frank Act").

3.      The Cincinnati Bell Board's decisions to increase CEO and top executive pay in 2010, despite the Company's severely impaired financial results, were disloyal, irrational and unreasonable, and not the product of a valid exercise of business judgment.  Instead, the Cincinnati Board's executive pay hikes violated its own pay-for-performance policy and, as intended, favored the interests of Cincinnati Bell's CEO and top executives at the expense of the corporation and its shareholders.

4.      The Cincinnati Bell Board is not entitled to business judgment protection for its 2010 executive pay hikes.  As evidenced by the adverse May 3, 2011 advisory say-on-pay vote, Cincinnati

659016_1

Bell shareholders, in their independent business judgment, concluded that the 2010 executive compensation was not in their best interests as Cincinnati Bell's shareholder owners. Under the business judgment rule, evidence that an executive pay decision is not in the shareholders' best interests is direct evidence that the board of directors did not act in the shareholders' best interests when approving it. Under the business judgment rule, these facts rebut the presumption that the Cincinnati Bell Board's 2010 executive pay decisions were a valid exercise of business judgment and shift the burden of proof to defendants to demonstrate that the 2010 executive compensation was independent, made in good faith and in the best interests of Cincinnati Bell's shareholders.

5.     Cincinnati Bell has been severely damaged by the excessive 2010 executive compensation. Nevertheless, the Cincinnati Bell Board has not publicly rescinded or otherwise modified the unlawful 2010 executive compensation. By this action, plaintiffs seek relief for Cincinnati Bell as a result of the Cincinnati Bell Board's breach of loyalty, its CEO and top executives' unjust enrichment, and its compensation consultant's aiding and abetting the Board's breaches of fiduciary duty.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction under 28 U.S.C. §1332(a)(1), because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

7.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this Court under 28 U.S.C. §1391(a) because: (i) Cincinnati Bell is incorporated and maintains its executive offices and principal place of business in this District; (ii) one or more of the defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Cincinnati Bell, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

9.      Plaintiff NECA-IBEW Pension Fund (The Decatur Plan) ("NECA-IBEW") is a shareholder of Cincinnati Bell and has been continuously since at least May 2003.  NECA-IBEW and its trustees Jim Bailey, Glenn Baugh, Shad Etchason, Michael Everett, Micheal Herbert, Steve McGruder, Lance Reece, E. Wes Anderson, William Belforte, Steve Billhymer, Thomas Conner, William Fricke, Mark Kawolsky, and Dan Wilcox are citizens of Illinois.  NECA-IBEW's trustees Kevin Cope, Joseph Langmeyer, Jim Ogden, Todd Thacker, Jon Huston, Ronald Roberts, Ted Uppole, and Larry Van Tries are citizens of Indiana.  NECA-IBEW's trustees Allan York and Ronnie Strickland are citizens of Georgia.

10.     Plaintiff Dennis Palkon is a shareholder of Cincinnati Bell and has been continuously since at least June 2009.  Palkon is a citizen of Pennsylvania.

11.     Nominal party Cincinnati Bell is an Ohio corporation with its executive offices located at 221 East Fourth Street, Cincinnati, Ohio 45202.  Cincinnati Bell is a full-service regional provider of data and voice communications services over wireline and wireless networks, and a reseller of information technology and telephone equipment.  Cincinnati Bell is a citizen of the State of Ohio.

- 3 -

659016_1

12.     Defendant John F. Cassidy ("Cassidy") is CEO and President of Cincinnati Bell.  He has also served on the Cincinnati Bell Board since 2002.  Although Cincinnati Bell's net income declined 68.4% in 2010, Cassidy's pay increased 71.7% to $8,562,462.  Thus, despite leading Cincinnati Bell to a $61.3 million decline in net income and a negative 18.8% annual shareholder return, Cassidy's total 2010 compensation substantially increased.  Cassidy has been unjustly enriched.  Defendant Cassidy is a citizen of the State of Ohio.

13.     Defendant Gary J. Wojtaszek ("Wojtaszek") is Chief Financial Officer of Cincinnati Bell.  Although Cincinnati Bell's net income declined 68.4% in 2010, Wojtaszek's pay increased 80.3% to $2,074,427.  Thus, despite leading Cincinnati Bell to a $61.3 million decline in net income and a negative 18.8% annual shareholder return, Wojtaszek's total 2010 compensation substantially increased.  Wojtaszek has been unjustly enriched.  Defendant Wojtaszek is a citizen of the State of Ohio.

14.     Defendant Christopher J. Wilson ("Wilson") is the Vice President and General Counsel of Cincinnati Bell.  Although Cincinnati Bell's net income declined 68.4% in 2010, Wilson's pay increased 54.3% to $1,421,794.  Thus, despite leading Cincinnati Bell to a $61.3 million decline in net income and a negative 18.8% annual shareholder return, Wilson's total 2010 compensation substantially increased.  Wilson has been unjustly enriched.  Defendant Wilson is a citizen of the State of Ohio.

15.     Defendant Phillip R. Cox ("Cox") has been a Cincinnati Bell director since 1993.  Cox has been Chairman of the Cincinnati Bell Board since 2003.  In 2010, he served on the Audit and Finance Committee and the Compensation Committee of the Cincinnati Bell Board.  Despite Cincinnati Bell's horrendous 2010 financial performance, which included a 68.4% decline in net income and a negative 18.8% annual shareholder return, defendant Cox still approved massive pay increases for Cincinnati Bell's CEO and top executives in 2010.  These pay raises not only were in

- 4 -

contravention of Cincinnati Bell shareholders' best interests, they also violated the Cincinnati Bell Board's purported executive compensation policy, which supposedly aligned executive pay with corporate performance. Increasing executive compensation for Cincinnati Bell's CEO and top executives from 54.3% to 80.3% was not rewarding superior performance, but rather corporate favoritism designed to unjustly enrich Cincinnati Bell's CEO and top executives at the expense of the Company. Defendant Cox is a citizen of the State of Ohio.

16. Defendant Bruce L. Byrnes ("Byrnes") has been an Cincinnati Bell director since 2003. In 2010, he served on the Compensation Committee of the Cincinnati Bell Board. Despite Cincinnati Bell's horrendous 2010 financial performance, which included a 68.4% decline in net income and a negative 18.8% annual shareholder return, defendant Brynes still approved massive pay increases for Cincinnati Bell's CEO and top executives in 2010. These pay increases not only were in contravention of Cincinnati Bell shareholders' best interests, they also violated the Cincinnati Bell Board's purported executive compensation policy, which supposedly aligned executive pay with corporate performance. Increasing executive compensation for Cincinnati Bell's CEO and top executives from 54.3% to 80.3% was not rewarding superior performance, but rather corporate favoritism designed to unjustly enrich Cincinnati Bell's CEO and top executives at the expense of the Company. Defendant Byrnes is a citizen of the State of Ohio.

17. Defendant Jakkie L. Haussler ("Haussler") has been a Cincinnati Bell director since 2008. In 2010, she served on the Audit and Finance Committee of the Cincinnati Bell Board. Despite Cincinnati Bell's horrendous 2010 financial performance, which included a 68.4% decline in net income and a negative 18.8% annual shareholder return, defendant Haussler still approved massive pay increases for Cincinnati Bell's CEO and top executives in 2010. These pay increases not only were in contravention of Cincinnati Bell shareholders' best interests, they also violated the Cincinnati Bell Board's purported executive compensation policy, which supposedly aligned

- 5 -

executive pay with corporate performance. Increasing executive compensation for Cincinnati Bell's CEO and top executives from 54.3% to 80.3% was not rewarding superior performance, but rather corporate favoritism designed to unjustly enrich Cincinnati Bell's CEO and top executives at the expense of the Company. Defendant Haussler is a citizen of the State of Ohio.

18.     Defendant Craig F. Maier ("Maier") has been a Cincinnati Bell director since 2008. In 2010, he served on the Audit and Finance Committee and the Compensation Committee of the Cincinnati Bell Board. Despite Cincinnati Bell's horrendous 2010 financial performance, which included a 68.4% decline in net income and a negative 18.8% annual shareholder return, defendant Maier still approved massive pay increases for Cincinnati Bell's CEO and top executives in 2010. These pay increases not only were in contravention of Cincinnati Bell shareholders' best interests, they also violated the Cincinnati Bell Board's purported executive compensation policy, which supposedly aligned executive pay with corporate performance. Increasing executive compensation for Cincinnati Bell's CEO and top executives from 54.3% to 80.3% was not rewarding superior performance, but rather corporate favoritism designed to unjustly enrich Cincinnati Bell's CEO and top executives at the expense of the Company. Defendant Maier is a citizen of the State of Ohio.

19.     Defendant Alex Shumate ("Shumate") has been a Cincinnati Bell director since 2005. In 2010, he served on the Compensation Committee of the Cincinnati Bell Board. Despite Cincinnati Bell's horrendous 2010 financial performance, which included a 68.4% decline in net income and a negative 18.8% annual shareholder return, defendant Shumate still approved massive pay increases for Cincinnati Bell's CEO and top executives in 2010. These pay increases not only were in contravention of Cincinnati Bell shareholders' best interests, they also violated the Cincinnati Bell Board's purported executive compensation policy, which supposedly aligned executive pay with corporate performance. Increasing executive compensation for Cincinnati Bell's CEO and top executives from 54.3% to 80.3% was not rewarding superior performance, but rather

corporate favoritism designed to unjustly enrich Cincinnati Bell's CEO and top executives at the expense of the Company. Defendant Shumate is a citizen of the State of Ohio.

20. Defendant John M. Zrno ("Zrno") has been an Cincinnati Bell director since 1999. In 2010, he served on the Audit and Finance Committee and as Chairman of the Compensation Committee of the Cincinnati Bell Board. Despite Cincinnati Bell's horrendous 2010 financial performance, which included a 68.4% decline in net income and a negative 18.8% annual shareholder return, defendant Zrno still approved massive pay increases for Cincinnati Bell's CEO and top executives in 2010. These pay increases not only were in contravention of Cincinnati Bell shareholders' best interests, they also violated the Cincinnati Bell Board's purported executive compensation policy, which supposedly aligned executive pay with corporate performance. Increasing executive compensation for Cincinnati Bell's CEO and top executives from 54.3% to 80.3% was not rewarding superior performance, but rather corporate favoritism designed to unjustly enrich Cincinnati Bell's CEO and top executives at the expense of the Company. Defendant Zrno is a citizen of the State of Texas.

21. Defendant Towers Watson & Co. ("TW") is an executive compensation advisory firm. Among other things, TW assisted the Cincinnati Bell Board in connection with the 2010 pay hikes for Cincinnati Bell's CEO and top executives described in Cincinnati Bell's 2011 proxy materials. TW is a citizen of the State of New York.

### THE DUTIES OF CINCINNATI BELL'S DIRECTORS AND OFFICERS

22. As directors and officers of Cincinnati Bell, the individual defendants owed Cincinnati Bell and its shareholders an unremitting duty of loyalty that requires the directors and officers to put the best interests of Cincinnati Bell shareholders ahead of their personal interests and the interests of Cincinnati Bell's corporate managers. Their fiduciary duty of loyalty may even be more unremitting when it comes to executive compensation. Directors who fail to act in the

- 7 -

shareholders' best interests breach their fiduciary duty of loyalty and may be held liable for damages. A claim for breach of duty is, as a matter of law, non-exculpable.

23.    The individual defendants, because of their positions of control and authority as directors and/or officers of Cincinnati Bell, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive positions and/or access to Cincinnati Bell's internal information, these defendants knew or should have known that increasing 2010 CEO and top executive pay from between 54.3% and 80.3% – despite the Company's 2010 $61.3 million decline in net income and negative 18.8% annual shareholder return – was unreasonably excessive and violated the Cincinnati Bell Board's own pay-for-performance executive compensation philosophy. The overwhelming rejection of the Cincinnati Bell Board's 2010 CEO and top executive pay hikes by Cincinnati Bell's shareholders also strongly evidences the fact that the 2010 pay hikes are not in the best interests of Cincinnati Bell and/or its shareholders. Instead, the Cincinnati Bell Board's 2010 pay hikes were irrational and unreasonable and not the product of a valid exercise of business judgment and, as intended by the Cincinnati Bell Board, served the interests of Cincinnati Bell's CEO and top executives at the expense of the Company and its shareholders.

24.    At times relevant hereto, defendants were the agents of each of the other defendants and were at all times acting within the course and scope of such agency.

## AIDING AND ABETTING AND CONCERTED ACTION

25.    In committing the wrongful acts particularized herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties.

- 8 -

26.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein.  In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his, her, or its overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

**The Cincinnati Bell Board's "Pay for
Performance" Executive Policy**

27.     Historically, the Cincinnati Bell Board has represented to Cincinnati Bell shareholders that the Company's executive compensation practices are firmly rooted in a pay-for-performance philosophy.  For example, as the Cincinnati Bell Board most recently stated in the Company's 2011 Proxy Statement, dated March 21, 2011 ("2011 Proxy Statement"):

> The guiding principles of the Company's compensation policies and decisions include aligning each executive's compensation with the Company's business strategy and the interests of our shareholders and providing incentives needed to attract, motivate and retain key executives who are important to our long-term success. Consistent with this philosophy, *a significant portion of the total compensation for each of our executives is directly related to the Company's earnings and revenues and other performance factors* that measure our progress against the goals of our strategic plan as well as performance against our peer companies.

> *        *        *

> •        Consistent with good corporate governance, our compensation program ties a substantial portion of executive compensation to our long-term company performance and shareholder returns.

> *        *        *

> The purpose of the 2011 Short Term Incentive Plan is to provide key executives of the Company and its subsidiaries with annual *incentive compensation based upon the achievement of company performance and individual performance goals*.

> *        *        *

- 9 -

The Company's compensation program has the following primary philosophy and objectives:

- Compensation must be competitive with other companies to attract and retain high-quality executives.

- A significant portion of total executive compensation should be "at risk" and *tied to the achievement of specific short-term and long-term performance objectives, principally the Company's earnings, cash flow and the performance of the Company's common shares*, thereby linking executive compensation with the returns realized by shareholders.

- Compensation should provide a balance among each executive's base salary and short-term and long-term incentive components appropriate to the current and long-term goals and strategy of the Company.

2011 Proxy Statement at 20-22, 32 (emphasis added).

**Cincinnati Bell's Atrocious 2010 Financial Results**

28.     In 2010, however, the relationship between executive compensation and corporate performance was virtually non-existent.  For example, in 2010, Cincinnati Bell posted a $61.3 million decline in net income and a negative 18.8% annual shareholder return.  The Company's 2010 net income applicable to common shareowners, earnings per share ("EPS"), and total shareholders' equity also all materially declined.  These material declines in Cincinnati Bell's business and financial performance are set forth graphically below:











29.     Defendants were not mere spectators to Cincinnati Bell's 2010 financial decline.  On the contrary, defendants were at all relevant times responsible for the management and oversight of Cincinnati Bell's business and affairs.  Throughout 2010, Cincinnati Bell's officers and directors regularly communicated with one another about Cincinnati Bell's financial performance and made decisions that directly and indirectly impacted the Company's 2010 financial results.  As a result, the Cincinnati Bell Board was a percipient witness to not only Cincinnati Bell's 2010 financial decline but also to the significant underperformance of Cincinnati Bell's CEO and top executives.

**The Cincinnati Bell Board's Excessive
2010 Executive Compensation**

30.     Notwithstanding Cincinnati Bell's disastrous 2010 results, Cincinnati Bell's executive compensation for the period still dramatically increased.  In 2010, Cincinnati Bell's CEO pay jumped 71.7% to over $8.5 million.  The compensation for Cincinnati Bell's CFO jumped even higher, rising 80.3% to over $2 million in 2010.  The compensation for Cincinnati Bell's Vice President and General Counsel also increased significantly, rising 54.3% to nearly $1.5 million.

- 13 -

31.    Notwithstanding Cincinnati Bell's dismal 2010 $61.3 million decline in net income and negative 18.8% annual shareholder return, the Cincinnati Bell Board approved each of the excessive 2010 pay hikes, which are set forth graphically below.







**Cincinnati Bell Shareholders Reject the
Excessive 2010 Executive Compensation**

32. On March 21, 2011, the Cincinnati Bell Board recommended shareholder approval of

the Company's 2010 executive compensation. In further support of its 2010 pay proposal, the

Cincinnati Bell Board stated:

### ADVISORY VOTE ON EXECUTIVE COMPENSATION
#### (Item 3 on Proxy Card)

Pursuant to Section 14A of the Securities Exchange Act of 1934, the
Company is required to submit a proposal to its shareholders for a non-binding
advisory vote to approve the compensation of the Company's named executive
officers, as disclosed in this Proxy Statement in accordance with the compensation
disclosure rules of the SEC. This proposal, commonly known as a "say-on-pay"
proposal, gives our shareholders the opportunity to express their views on the
compensation of our named executive officers. This vote is not intended to address
any specific item of compensation, ***but rather the overall compensation of our
named executive officers and the principles, policies and practices*** described in this
Proxy Statement.

The guiding principles of the Company's compensation policies and
decisions include aligning each executive's compensation with the Company's
business strategy and the interests of our shareholders and providing incentives

- 15 -

needed to attract, motivate and retain key executives who are important to our long-term success. Consistent with this philosophy, *a significant portion of the total compensation for each of our executives is directly related to the Company's earnings and revenues and other performance factors that measure our progress against the goals of our strategic plan as well as performance against our peer companies*. Shareholders are urged to read the Compensation Discussion and Analysis section of this Proxy Statement which discusses how our compensation design and practices reflect our compensation philosophy. The Compensation Committee and the Board of Directors believe that our compensation design and practices are effective in implementing our strategic goals. Accordingly, we ask our shareholders to vote "FOR" the following resolution:

"**RESOLVED**, that the compensation paid to the Company's named executive officers, as disclosed pursuant to Item 402 of Regulation S-K, including the Compensation Discussion and Analysis, compensation tables and narrative discussion, is hereby APPROVED."

The say-on-pay vote is advisory and, therefore, not binding on the Company, the Compensation Committee or the Board of Directors. Our Board of Directors and our Compensation Committee value the opinions of our shareholders and to the extent there is any significant vote against the named executive officer compensation as disclosed in this Proxy Statement, *we will consider our shareholders' concerns* and the Compensation Committee will evaluate whether any actions are necessary to address those concerns.

Approval of this proposal requires the affirmative vote of the holders of a majority of the common shares and 6 3/4% Cumulative Convertible Preferred Shares, voting as one class, present in person or represented by proxy at the annual meeting and entitled to vote on this proposal. Under the rules of the NYSE, brokers are prohibited from giving proxies to vote on executive compensation matters unless the beneficial owner of such shares has given voting instructions on the matter. This means that, if your broker is the recordholder of your shares, you must give voting instructions to your broker with respect to this Item 3 if you want your broker to vote your shares on this matter. Proxies submitted without direction pursuant to this solicitation will be voted for the approval of the compensation of our named executive officers, as disclosed in this Proxy Statement. Abstentions will have the same effect as a vote against this proposal. Broker non-votes are not considered shares entitled to vote on this proposal and will have no impact on the outcome of this proposal.

**Our Recommendation**

*The Board recommends that shareholders vote "FOR" the approval, on an advisory basis, of the compensation of its named executive officers as disclosed in this Proxy Statement*.

2011 Proxy Statement at 20 (emphasis added and in original).

33.     Importantly, defendants have never suggested that the information contained in the 2011 Proxy Statement regarding the 2010 executive compensation was inaccurate, incomplete or otherwise infirm.  On the contrary, by setting forth their justification for the 2010 executive pay hikes in the 2011 Proxy Statement, including in the Compensation Discussion and Analysis section as well as in the pay proposed itself, the Cincinnati Bell Board enabled Cincinnati Bell shareholders to assess whether the 2010 executive compensation was in the shareholders' best interests based on the same information that was available to the Cincinnati Bell Board.  Thus, in assessing whether the 2010 executive compensation was in the shareholders' best interests, the Cincinnati Bell Board and Cincinnati Bell's shareholders were on a level playing field.

34.     Cincinnati Bell's shareholder base consists primarily of sophisticated institutional investors who own millions of Cincinnati Bell shares worth tens of millions of dollars.  These types of sophisticated shareholders possess the experience, expertise and resources to assess, in their own independent business judgment, whether executive compensation is in their best interests as shareholder owners.  And, as discussed below, they did precisely that in connection with Cincinnati Bell's May 3, 2011 advisory say-on-pay executive compensation vote.

35.     In late 2010, Congress enacted the Dodd-Frank Act say-on-pay advisory shareholder vote.  Although non-binding, the vote tests whether the corporation's executive pay is in the shareholders' best interests.  Here, Cincinnati Bell shareholders concluded that the 2010 executive compensation was not.  Specifically, despite the Cincinnati Bell Board's unanimous recommendation that shareholders approve the 2010 executive compensation, on May 3, 2011, Cincinnati Bell shareholders rejected it.  According to the Company, 66% of voting Cincinnati Bell shareholders voted "AGAINST" the 2010 executive compensation.  *See* SEC Report on Form 8-K, dated May 9, 2011.

36.     The result of Cincinnati Bell's say-on-pay vote is direct and probative evidence that the 2010 executive compensation was not in the best interests of Cincinnati Bell shareholders, and correspondingly that the Cincinnati Bell Board did not act in the best interests of Cincinnati Bell shareholders when approving it.  Directors who fail to act in furtherance of the shareholders' best interests breach their unremitting duty to loyalty.  Consequently, Cincinnati Bell's adverse say-on-pay vote is direct and probative evidence rebutting the presumption that the Cincinnati Bell Board's 2010 executive pay decisions were in the best interests of Cincinnati Bell shareholders and shifts the burden of proof to defendants to prove that the 2010 executive compensation was independent, made in good faith and in the best interests of Cincinnati Bell shareholders.

## DAMAGE TO CINCINNATI BELL

37.     Cincinnati Bell has been severely injured by the Cincinnati Bell Board's excessive 2010 CEO and top executive compensation.  In 2010, Cincinnati Bell posted a 68.4% decline in net income and a negative 18.8% annual shareholder return.  Its earnings per share also declined 75.7% and it total shareholder equity also declined 2%.  Nevertheless, the Cincinnati Bell Board increased 2010 CEO and top executive compensation between 54.3% and 80.3%.  This was not pay-for-performance, but rather pay-for-under-performance.

38.     When asked by the Cincinnati Bell Board to assess whether the 2010 executive compensation served the shareholders' best interests, Cincinnati Bell shareholders resounding rejected it.  Cincinnati Bell shareholders concluded, in their independent business judgment, that the 2010 CEO and top executive pay hikes contravened their best interests as Cincinnati Bell's shareholder owners.  Nevertheless, the Cincinnati Bell Board has not publicly rescinded or amended the 2010 executive compensation to the detriment of the Company.  As a result, Cincinnati Bell's CEO and top executives have been unjustly enriched.

39.     By this action, plaintiffs seek to recover relief for Cincinnati Bell against the Cincinnati Bell Board for their breach of loyalty, Cincinnati Bell's CEO and top executives for unjust enrichment, and Cincinnati Bell's compensation consultant for aiding and abetting breaches of fiduciary duty.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

40.     Plaintiffs incorporate ¶¶1-39.

41.     Pursuant Rule 23.1 of the Federal Rules of Civil Procedure, plaintiffs bring this action derivatively on behalf of Cincinnati Bell to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of defendants' misconduct.  Plaintiffs are shareholders of Cincinnati Bell and will adequately represent the interests of the Company in this litigation.

42.     A pre-suit demand upon the Cincinnati Bell Board is a useless and futile action, and therefore excused, for several reasons.  First, a pre-suit demand is excused because the entire Cincinnati Bell Board faces a substantial likelihood of liability for breach of loyalty.  After approving the unlawful 2010 pay hikes for Cincinnati Bell's CEO and top executives, the Cincinnati Bell Board then recommended that shareholders approve the 2010 executive compensation.  The Cincinnati Bell Board's decisions authorizing the 2010 executive pay were not in Cincinnati Bell shareholders' best interests and violated the Cincinnati Bell Board's own pay-for-performance executive compensation policy.  In fact, on May 3, 2011, Cincinnati Bell shareholders overwhelmingly rejected the 2010 executive compensation in Cincinnati Bell's first ever say-on-pay executive compensation vote.  Although non-binding, a say-on-pay vote tests whether the corporation's executive compensation is in the shareholders' best interests.  Here, Cincinnati Bell shareholders concluded, in their independent business judgment, that it was not.  The result of Cincinnati Bell's advisory say-on-pay vote is direct and probative evidence that the 2010 executive compensation was not in the shareholders' best interests, and correspondingly that the Cincinnati

Bell Board did not act in the shareholders' best interests when approving it.  Evidence showing that directors failed to act in the shareholders' best interests rebuts the presumption that the Cincinnati Bell Board's 2010 executive compensation decisions are entitled to business judgment protection. This evidence further demonstrates that the Cincinnati Bell Board is *prima facie* liable for breach of loyalty.  Claims for breach of loyalty are non-exculpable.  Based on the foregoing, the Cincinnati Bell Board faces a substantial likelihood of liability for breach of loyalty for authorizing the 2010 executive compensation.  Therefore, a pre-suit demand upon the Cincinnati Bell Board before commencing this action was unnecessary.

43.     A pre-suit demand on defendant Cassidy is excused because his principal professional occupation is his employment as CEO of Cincinnati Bell.  Accordingly, Cassidy has received and continues to receive substantial monetary compensation and other valuable benefits (including the excessive compensation complained of herein).  Thus, Cassidy lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action. Moreover, Cassidy was unjustly enriched by the 2010 CEO and top executive pay hikes, and, as a result, financially benefitted from the misconduct challenged herein.  Accordingly, a pre-suit demand upon Cassidy to take action with respect to the 2010 CEO and top executive pay hikes is a useless and futile act and therefore excused.

44.     Plaintiffs have not made any demand on shareholders of Cincinnati Bell to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Cincinnati Bell is a publicly traded company with approximately 198 million shares outstanding, and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendants Cox, Byrnes, Haussler, Maier, Shumate, and Zrno for Breach of Fiduciary Duty of Loyalty

45.     Plaintiffs incorporate ¶¶1-44.

46.     As Cincinnati Bell's directors, defendants Cox, Byrnes, Haussler, Maier, Shumate, and Zrno owe Cincinnati Bell and its shareholders an unremitting duty of loyalty that requires them to always put the best interests of Cincinnati Bell's shareholders ahead of their personal interests and the interests of third parties, including Cincinnati Bell's corporate managers.  By adopting pay-for-performance as Cincinnati Bell's executive compensation policy, defendants Cox, Byrnes, Haussler, Maier, Shumate, and Zrno owed Cincinnati Bell and its shareholders a fiduciary duty of loyalty and candor to adhere to that executive compensation policy when approving compensation for Cincinnati Bell's CEO and top executives in 2010.

47.     Defendants Cox, Byrnes, Haussler, Maier, Shumate, and Zrno breached their duty of loyalty (and candor and good faith) owed to Cincinnati Bell and its shareholders by approving the 2010 executive pay hikes.  The decision to increase executive pay in 2010 was neither in the best interests of Cincinnati Bell's shareholders, nor consistent with the Cincinnati Bell Board's pay-for-performance executive compensation policy.  As evidenced by the May 3, 2011 adverse advisory say-on-pay vote, Cincinnati Bell shareholders, in their independent business judgment, concluded that the 2010 executive compensation was not in their best interests as Cincinnati Bell shareholder owners.

48.     Defendants Cox, Byrnes, Haussler, Maier, Shumate, and Zrno's misconduct was not due to an honest error of judgment, but rather to their bad faith and was done knowingly, willfully,

intentionally or recklessly for the purpose of favoring the interests of Cincinnati Bell's CEO and top executives at the Company's expense.

49.     By reason of the 2010 pay hikes, defendants Cox, Byrnes, Haussler, Maier, Shumate, and Zrno failed to act in Cincinnati Bell shareholders' best interests.  Instead, the Cincinnati Bell Board violated its own executive compensation policy for the purpose of favoring Cincinnati Bell's CEO and top executives at the expense of Cincinnati Bell and its shareholders.  In doing so, defendants Cox, Byrnes, Haussler, Maier, Shumate, and Zrno breached their fiduciary duty of loyalty owed to Cincinnati Bell and its shareholders.  As a result, Cincinnati Bell and its shareholders have been damaged and injured.

50.     Moreover, by paying executive compensation in breach of their fiduciary duty of loyalty, defendants Cox, Byrnes, Haussler, Maier, Shumate, and Zrno rendered untrue their statements about following a pay-for-performance executive compensation policy.  As a result, Cincinnati Bell and its shareholders have been damaged and injured.

## COUNT II

### Against Defendant TW for Aiding and Abetting
### Breaches of Fiduciary Duties

51.     Plaintiffs incorporate ¶¶1-44.

52.     Defendants Cox, Byrnes, Haussler, Maier, Shumate, and Zrno breached their fiduciary duty of loyalty owed to Cincinnati Bell and its shareholders by approving and then unanimously recommending shareholder approval of the excessive 2010 executive compensation.

53.     Defendant TW aided and abetted and rendered substantial assistance in the Cincinnati Bell Board's breach of fiduciary duty.  In taking such actions to substantially assist the commission of the wrongdoing detailed herein, defendant TW acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of its overall contribution to and furtherance of the wrongdoing.

- 22 -

659016_1

54.     By reason of the foregoing, defendant TW has aided and abetted the Cincinnati Bell Board's breaches of fiduciary duty.  As a result, Cincinnati Bell and its shareholders have been damaged and injured.

## COUNT III

### Against Defendants Cassidy, Wojtaszek and Wilson
### for Unjust Enrichment

55.     Plaintiffs incorporate ¶¶1-44.

56.     The 2010 pay hikes for Cincinnati Bell's CEO and top executives violated Cincinnati Bell's pay-for-performance policy, and were unwarranted in light of Cincinnati Bell's dismal 2010 financial performance.  By reason of the foregoing, defendants Cassidy, Wojtaszek and Wilson have been unjustly enriched.  As a result, Cincinnati Bell and its shareholders have been damaged and injured.

57.     The benefits of the excessive executive compensation were conferred upon defendants Cassidy, Wojtaszek and Wilson.

58.     Defendants Cassidy, Wojtaszek and Wilson knew they were receiving the benefits of excessive executive compensation.

59.     Under the circumstances – the dismal financial performance of the Company – it would be unjust to allow defendants Cassidy, Wojtaszek and Wilson to retain the benefits of the excessive executive compensation.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.     Against defendants and in favor of Cincinnati Bell for the amount of damages sustained by the Company as a result of defendants' violations of law;

B.     Declaring that the result of Cincinnati Bell's advisory say-on-pay vote, in which 66% of voting shareholders rejected the 2010 executive compensation as not in the shareholders' best

interest, is sufficient evidence to rebut the presumption that the Cincinnati Bell Board's decisions regarding the 2010 executive compensation were in the best interests of shareholders and a valid business judgment;

C.      Extraordinary equitable and/or injunctive relief as necessary or permitted by law, equity and the statutory provisions sued hereunder, including disgorgement, attachment, impoundment, imposition of a constructive trust on or otherwise restricting the disposition/exercise of improvidently awarded 2010 executive compensation;

D.      Ordering the implementation and administration of internal controls and systems at Cincinnati Bell designed to prohibit and prevent the payment of excessive compensation to Cincinnati Bell's CEO and/or top executives;

E.      Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, and accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  October 21, 2011               ROBBINS GELLER RUDMAN & DOWD LLP
                                       TRAVIS E. DOWNS III
                                       BENNY C. GOODMAN III
                                       FRANCIS A. DIGIACCO


                                                   s/ Travis E. Downs III
                                       _____
                                                 TRAVIS E. DOWNS III

                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

- 24 -

659016_1

LANDSKRONER • GRIECO • MERRIMAN, LLC
JACK LANDSKRONER (0059227)
DREW LEGANDO (0084209)
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

CAVANAGH & O'HARA
PATRICK J. O'HARA
407 East Adams Street
Springfield, IL  62701
Telephone:  217/544-1771
217/544-9894 (fax)

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
121 N. Wayne Avenue, Suite 100
Wayne, PA  19087
Telephone:  610/225-2677
610/225-2678 (fax)

Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 21, 2011.

s/ Travis E. Downs III
TRAVIS E. DOWNS III

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: travisd@rgrdlaw.com

# Mailing Information for a Case 1:11-cv-00451-TSB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James Eugene Burke**
  jburke@kmklaw.com,lrecord@kmklaw.com

- **Grant Spencer Cowan**
  gcowan@fbtlaw.com

- **Francis A DiGiacco**
  fdigiacco@rgrdlaw.com

- **Travis E Downs , III**
  travisd@rgrdlaw.com

- **Benny C Goodman , III**
  bennyg@rgrdlaw.com

- **Douglas Edward Hart**
  dhart@douglasehart.com

- **Matthew Joseph Horwitz**
  mhorwitz@fbtlaw.com

- **Jack Landskroner**
  jack@lgmlegal.com,debra@lgmlegal.com

- **Jason J Mendro**
  JMendro@gibsondunn.com

- **Andrew Tulumello**
  ATulumello@gibsondunn.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)